## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **GREAT AMERICAN OPPORTUNITIES, INC.,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action No. _____** |
| **CHERRY BROTHERS, LLC d/b/a CHERRYDALE FARMS FUNDRAISING, RENE ULLOA, MATTHEW L. PARKIN, TODD ALLEN MILLS, and REBECCA FRANCIS,** | ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## VERIFIED COMPLAINT

Plaintiff Great American Opportunities, Inc. ("Great American") states as follows for its complaint against Defendants Cherry Bros., LLC, d/b/a Cherrydale Farms Fundraising ("Cherrydale"), Rene Ulloa ("Ulloa"), Matthew L. Parkin ("Parkin"), Todd Allen Mills ("Mills"), and Rebecca Francis ("Francis").

## NATURE OF CASE

1.      Great American has filed this action for preliminary and permanent injunctive relief and monetary damages based upon Defendants' breaches of their covenants not-to-compete with Great American, tortious interference with those covenants, violations of the federal Defend Trade Secrets Act (DTSA), violations of the Tennessee Trade Secret Act (TSA), and other claims arising under the substantive laws of Tennessee.

## THE PARTIES

2.     Great American is a corporation duly organized under the laws of the State of Tennessee and has its principal place of business located at 2451 Atrium Way, Nashville, Tennessee.

3.     Cherrydale is a limited liability company organized under the laws of the State of Delaware and has its principal place of business located at 146 Montgomery Avenue, Bala Cynwyd, Pennsylvania.  Cherrydale's registered agent may be served at Registered Office Service Company, 203 NE Front Street, Suite 101, Milford, Delaware 19963.  Upon information and belief, none of Cherrydale's members are residents of the State of Tennessee.

4.     Upon information and belief, Ulloa resides at 2936 Royal Virginia Court, Louisa, Virginia.  Ulloa was employed by Great American in a sales management capacity as a Director.  Upon information and belief, Ulloa currently is employed by Cherrydale as Vice President of Strategy and Administration.

5.     Upon information and belief, Parkin resides at 2159 Sioux Drive, Sarasota, Florida.  Parkin was employed by Great American as a commissioned sales representative.  Upon information and belief, Parkin currently is employed by Cherrydale as Director of Business Development.

6.     Upon information and belief, Mills resides at 11761 Pine Needles Drive, Providence Forge, Virginia.  Mills was previously employed by Great American as a commissioned sales representative.  Upon information and belief, Mills currently is employed by Cherrydale as Sales Manager.

7.     Upon information and belief, Francis resides at 4964 Grand Oak Circle, St. Petersburg, Florida.  Francis was previously employed by Great American as a commissioned sales representative.  Upon information and belief, Francis currently is employed by Cherrydale as a Fundraising Director.

8.     Defendants Ulloa, Parkin, Mills, and Francis are sometimes collectively referred to herein as the "Individual Defendants."

## JURISDICTION AND VENUE

9.     Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over Great American's claim under the DTSA, 18 U.S.C. §§ 1836, *et seq.*

10.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Great American's state law claims because they arise from and form part of the same controversy from which Great American seeks relief.

11.     Pursuant to 28 U.S.C. § 1332, this Court also has subject matter jurisdiction over this matter because the amount in controversy exceeds $75,000 and is between citizens of different states.

12.     This Court has personal jurisdiction over each of Defendants because they have transacted business in Tennessee (including in Nashville), engaged in the wrongful acts alleged herein in Tennessee, and/or engaged in the wrongful acts alleged herein outside of Tennessee that have caused Great American to suffer harm within Tennessee.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and (b)(3).

14. Personal jurisdiction and venue are also proper in this Court as to the Individual Defendants pursuant to the forum selection clause set forth in each of the Individual Defendants' respective Employment Agreements with Great American, all of which are attached hereto as <u>Exhibits A- E</u>. Pursuant to the terms of those agreements, the Individual Defendants expressly consented to the exclusive venue and personal jurisdiction of the state and federal courts situated in Nashville, Davidson County, Tennessee relative to any action brought by and between the parties in connection with the Employment Agreements.

## FACTUAL BACKGROUND

### A.  Great American

15. Great American was founded in 1975 and is part of the Southwestern family of companies which has roots stemming back over 165 years and includes the oldest direct selling company in America.

16. Great American is engaged in the highly competitive business of fundraising. In particular, Great American partners with schools, councils, groups, other civic organizations, and communities throughout the United States to promote and add value to their fundraising programs by way of Great American's sales consultants (*i.e.*, representatives) and by way of Great American's role as a wholesaler of products.

17. Great American is the nation's leader in providing fundraising solutions and runs as many as 25,000 fundraising programs each year for about 16,000 different accounts.

**B.     Great American's Trade Secrets and Confidential Information**

18.     Great American develops, maintains, uses, and relies upon various trade secrets, other confidential business information, and proprietary systems to effectively operate and compete in the very aggressive fundraising industry.

19.     Great American's trade secrets and other confidential business information include, but are not limited to, the following:  business plans, marketing and promotional strategies, financial data, sales training materials, actual and potential customer lists and related information, past and current fundraising programs, sales representative contact and performance information, pricing information and strategies, competitive business information, and industry know-how.

20.     Great American has invested and does invest considerable time, money, and effort to develop its company-wide and divisional business plans and strategies, marketing and promotional strategies, and financial data, including financial forecasts and performance data.  Great American formulates and updates these plans, strategies, and data on a regular basis.

21.     Great American has invested and does invest considerable time, money, and effort to develop its sales force and its book of business.  Upon hire, Great American provides its new sales representatives (such as the Individual Defendants) proprietary sales, product, and financial support and training to become productive in sales for Great American.  As a long-time manager, Ulloa had significant involvement in building Great American's sales force during his term of employment with Great American.

22.     Great American has invested and does invest substantial time, money and effort to work with its actual and potential customers learning the specialized needs and preferences of each customer, determining how those needs match the capabilities of Great American's offerings, and developing tailor-made, customer-specific programs and service arrangements that will optimize fundraising programs.

23.     Once a customer relationship is established, Great American engages in an intensive process to raise the greatest amount of money and earn the greatest amount of profit possible for the customer.  This process includes, but is not limited to, developing specialized programs for each customer to raise awareness and enthusiasm regarding the particular fundraising program.  This process also can include elaborate presentations made to the customer organization.  After a particular fundraising program is concluded, Great American continues to work with its customers to identify key data and other information that can be used to further optimize similar programs in the future.

24.     Great American gathers, stores, and uses large amounts of information regarding its sales representatives (such as the Individual Defendants) and its customers and account base.

25.     Great American compiles, updates, and uses its sales representatives' contact information (name, address, phone numbers, email address, etc.) and performance information (sales, contracts, commissions, etc.).

26.     Additionally, Great American compiles, updates, and uses information related to the schools and groups that participate in Great American's fundraising programs and for prospective schools and groups.  For the participating schools and

groups, this information includes, but is not limited to, school/group and associated contact information, school principal and associated contact information, school secretary and associated contact information, teachers and associated contact information, parent-related organizations and key parent leadership information, and current and prior fundraising program sponsors and associated contact information. Great American's compilation and constant updating of its particularized contact information is critical to Great American sustaining current customer relations and prospecting future business.

27. Great American also maintains detailed records pertaining to specific fundraising programs it operates throughout the country. Great American compiles and utilizes detailed information regarding sales, fundraising, customers, accounts, and programs, including, but not limited to, fundraising program histories, product line runs, methods and content of marketing, awarding prizes, the grades and numbers of program participants, total sales, net profit to the participating schools/groups, future fundraising goals of participating schools/groups, preferred seasonal program scheduling, fundraising concepts and goals, customer information, and expenses incurred and net profit generated by Great American.

28. Great American has invested substantial amounts of time, money and effort to develop effective fundraising strategies and programs, and effective pricing strategies that lead to optimal profit for Great American as well as optimal return for Great American's customers.

29.     Great American's customer and account data is captured from the fundraising program sponsors and school principals (or their designees) with whom Great American and its sales representatives are working.

30.     Great American's trade secrets, confidential information, and proprietary systems are maintained digitally in servers and computers and in business records maintained at Great American's home office located at 2451 Atrium Way, Nashville, Tennessee.  Physical access is controlled and restricted by a combination of security personnel and other gatekeepers at the main points of ingress and egress into the home office building, electronic access cards, and a sign-in log for visitors at the receptionist's desk at the main entrance.  Elevator use is restricted by passcode activation during weekends.  Physical access to Great American's computer servers is further limited and restricted to a select group of administrators designated by the Vice President of Information Services.

31.     Each sales representative is given authorized access to such confidential information to enable their sales and work duties for Great American.  Upon information and belief, each of the Individual Defendants had stored such confidential information of Great American on their personal computer devices, including a company-owned iPad in the case of Ulloa, over the course of their respective terms of employment with Great American; however, they are not authorized to possess any such confidential information of Great American, whether digitally or hard copy, upon their resignations.

32.     Great American is a PCI-compliant corporation (Payment Card Industry Data Security Standard), which requires vigilant monitoring and heightened security over

the data stored in its servers and other electronic resources. Great American maintains several layers of security to protect its data, including the business-critical information outlined above.

33.     Access to the business-critical data outlined above is based on assigned authorizations for only those persons working for Great American who require that access as an integral part of their job duties. That access is via password-protected systems over secure channels.

34.     Great American expends tens of thousands of dollars each year and thousands of personnel/enterprise hours each year to secure and manage the business-critical information outlined above.

35.     The data is retrievable by authorized personnel on a need-to-know basis by way of a proprietary automated system built for Great American on a SAP platform.

36.     Great American takes additional measures to protect its trade secrets and other confidential information. For example, each sales representative, including the Individual Defendants, is required to execute an agreement of nondisclosure and is required to comply with his/her obligations of confidentiality as a condition of employment. Each employee must comply with Great American's policies and procedures relative to security and data confidentiality and must avoid any conflict of interest that would jeopardize confidentiality where applicable.

37.     Great American treats and considers the business-critical information outlined above as trade secrets and valuable confidential information that is not readily known to the public, including competitors.

38. Subsequent to a sales representative leaving his/her employment, the departing employee typically is reminded of his/her contractual obligations owed to Great American, including their obligation not to keep, use, or disclose Great American's confidential information.

39. When Great American learns of competitors potentially using its trade secrets and other confidential information, Great American typically will send a cautionary letter or cease and desist notification to the competitor.

## C. Individual Defendants' Employment with Great American

### Defendant Ulloa

40. Ulloa was employed by Great American from April 14, 2003 to March 29, 2017, when he voluntarily resigned.

41. Although his title changed over the course of his nearly 14-year employment, Ulloa worked for Great American primarily as a Sales Manager and was tasked with exercising his best efforts to promote and solicit the maximum number of sales of products and services offered by Great American in fundraising and to service Great American's accounts in furtherance of achieving goals set by Great American.

42. At the start of his employment, Ulloa was required to execute Great American's Employment Agreement that was in effect at the time, a true and correct copy of which is attached hereto as Exhibit A (the "Ulloa 2003 Agreement").

43. At first, Ulloa worked for Great American predominantly in a sales capacity. During that time, Ulloa was one of Great American's top producers and among the leaders in sales rankings.

44. During or about 2004, Ulloa was promoted to the position of Sales Manager. Ulloa ultimately managed Great American's accounts in, among other sales territories, Virginia, Maryland, Maine, Massachusetts, New Jersey, Delaware, and portions of Connecticut, Pennsylvania, and North Carolina.

45. The territories that Ulloa managed were very profitable. For example, the sales representatives who Ulloa managed generated net wholesale revenues of nearly $7,500,000 for schools and groups for the period beginning July 1, 2016 and ending February 28, 2017 (*i.e.* the entire Fall 2016 season and part of the Spring 2017 season).

46. In 2015, Ulloa was promoted to the position of Director, the highest sales management position in the company. Ulloa was one of only six (6) such Directors for Great American and, in that position, he had extensive and authorized access to the most business-critical confidential and proprietary information of Great American. At that time, Ulloa negotiated a new compensation package and signed a new Employment Agreement, effective April 25, 2015, a true and correct copy of which is attached hereto as Exhibit B ("Ulloa 2015 Agreement").

47. In Section 3 of the Ulloa 2015 Agreement, Ulloa agreed that in view of his "particularly important and mission-critical position in sales leadership" and the fact that he would have "heightened access to and authority to use a greater level of the secured systems and networks and confidential information of the Company," he owed Great American a fiduciary duty. Ulloa agreed that his fiduciary duty mandated that he avoid "causing or allowing injurious or wrongful activity to the detriment of the Company and others, any conflict of interest, self-dealing, or violation of law."

48.    In Section 6(A) of the Ulloa 2015 Agreement, Ulloa agreed that during his

employment and for a period of one year after his termination with Great American:

> Employee shall not directly or indirectly engage in or cause, or induce,
> any other person or entity to engage in or cause, unfair or wrongful
> competition to the detriment of Company.  Reference herein to "unfair
> or wrongful competition" includes, without limitation, competitive
> activity which involves or is enabled by (i)·activity prohibited by law
> (statutory or otherwise, such as unfair business practices, false
> advertising, misappropriation of trade secrets, libel, etc.); (ii) access to
> and unauthorized use and/or disclosure of Confidential Information of
> the Company; (iii) knowingly promoting, accepting and fulfilling orders
> from Company's active accounts in fundraising competition with the
> Company; and/or (iv) promoting, accepting, and fulfilling orders and
> requests for fundraising programs and related products, services, prizes
> and brochures reasonably comparable in nature and scope to the
> products, services, prizes and brochures offered and provided by
> Company, whether for the Employee's own benefit or for the benefit of
> any third party in any restricted area.  Reference herein to "restricted
> area," as specifically negotiated by the parties hereto, shall mean and
> include the States of Maine, New Hampshire, Vermont, Delaware,
> Massachusetts, New Jersey and Virginia (excluding Fairfax County) and
> the city-county governmental subdivisions of greater Philadelphia,
> Pennsylvania, greater Baltimore, Maryland, and greater Greensboro,
> North Carolina where employee has managed and supervised any sales
> managers, sales reps, and other persons with authorized access to the
> Confidential Information of the Company.

49.    In Section 6(C) of the Ulloa 2015 Agreement, Ulloa further agreed that

during his employment and for a period of one year after his termination with Great

American:

> Employee shall not directly or indirectly (i.e. by third parties or online)
> solicit, incentivize, call on, or accept business from any Fundraising
> clients, accounts, program sponsors and competitors of the Company
> with the intent or result of diverting, severing or diminishing the
> business and related economic opportunity of the Company.

50.     In Section 7(A) of the Ulloa 2015 Agreement, Ulloa further agreed to the trade secret and confidential nature of the information that was provided to him in connection with his employment, and he agreed "to keep confidential and not disclose, alter, or transfer any Confidential Information of the Company and its related entities except solely to carry out Employee's duties according to this Agreement and in the best interests of the Company . . . ."

51.     Section 7(A) of the 2015 Ulloa Agreement defines "Confidential Information" as including "[among] other things, the financial data, business strategies, pay plans and incentives, vendor terms, costs of goods made and sold, sales rankings, pricing strategies and profitability, acquisition targets, client lists and account information (including contact information), private personnel information, and special know-how of the Company."

52.     Section 16 of the 2015 Ulloa Agreement provides that the contract would be interpreted and enforced in accordance with the laws of the State of Tennessee.

53.     Great American paid Ulloa a considerable amount of compensation, bonuses, and business allowances during the course of his employment with Great American.  For example, Great American paid Ulloa total compensation of more than $300,000 in 2016.  During his employment, Ulloa additionally received significant benefits each year through his participation in, among other things, the following Great American offerings: health insurance, life insurance, participation in Great American's stock program with dividends, a 401k and Profit Sharing Plan, incentive trips, awards and paid vacation.

54.     In connection with his employment with Great American, Ulloa was provided access to and was entrusted with Great American's trade secrets and other confidential information as outlined herein.

55.     Following Ulloa's resignation, Great American sent Ulloa a letter on April 10, 2017 reminding him of his obligations under, among other things, the Ulloa 2015 Agreement, including his obligation not to disclose Great American's trade secrets and other confidential information. A true and correct copy of that letter is attached hereto as Exhibit F.

56.     During the course of his employment, Great American provided Ulloa with a company-owned iPad to perform his duties as a manager and later as a Director. Upon information and belief, Ulloa used that iPad to store all or portions of Great American's trade secret and confidential business information outlined above. Following his resignation, Great American made repeated requests to Ulloa demanding that he return the iPad to Great American. To date, however, Ulloa has refused to return the iPad to Great American.

57.     Great American recently discovered that just prior to his resignation, Ulloa wrongfully obtained a digital file that contained a new brochure to be distributed by Great American for upcoming seasons entitled "The Superb Collection." That file contains copyrighted content and images proprietary to Great American, as well as details of Great American's upcoming business plans. Upon information and belief, Ulloa took that file for the specific purpose of using the information contained in the file to assist Cherrydale in competing unfairly with Great American.

**Defendant Parkin**

58.    Parkin was employed by Great American from April 9, 2003 to January 23, 2017, when he voluntarily resigned.

59.    Parkin worked for Great American as a sales representative and was tasked with exercising his best efforts to promote and solicit the maximum number of sales of products and services offered by Great American in fundraising and to service Great American's accounts in furtherance of achieving goals set by Great American.

60.    At the start of his employment, Parkin was required to execute Great American's Employment Agreement that was in place at the time, a true and correct copy of which is attached hereto as Exhibit C (the "Parkin Agreement").

61.    In Section 4(a) of the Parkin Agreement, Parkin agreed and covenanted that for a period of two years after his employment with Great American ended, he would not:

> [C]ompete against the Company in a sales or sales management position, or otherwise engage in, directly or indirectly (including, by way of example only, as a principal, partner, venturer, employee or· agent), nor have any direct or indirect interest in any business which engages in, the marketing and selling of products and services on school campuses and to schools, school organizations, groups or clubs, civic groups or other organizations, with the intent of fund raising, which are located within the Territory or Territories assigned to Employee under this Agreement or under prior like Agreements of the parties.

62.    In Section 4(b) of the Parkin Agreement, Parkin further agreed and covenanted that for a period of two years after his employment with Great American ended, he would not:

> [S]olicit within any Territory assigned to Employee for the potential sale and distribution of products and services comparable to the products and services sold and rendered by Company and its affiliates,

by mail, phone, Internet, personal meeting, or by any other means, either directly or indirectly, any account, customer or sponsor of Company whom Employee or his/her sales associates sold and serviced in said Territory or Territories, whether or not such accounts, customers or sponsors were made known to Employee during his/her employment with Company.

63.     In Section 5(a) of the Parkin Agreement, Parkin also agreed to the trade secret classification and confidential nature of the information that was provided to him in the course of his employment, and he agreed: "Except to perform under this Agreement, [Parkin] will not use, keep or disclose any trade secrets and other confidential information of [Great American], its affiliates and licensees for any reason or purpose, whatsoever."

64.     Section 5(a) of the Parkin Agreement defines "trade secrets and other confidential Information" as including:

> [W]ithout limitations all customer information developed, used and maintained by Company, and developed used and maintained by the Company's sales representatives, including the identification and compilations of customers, as well as Great American training programs, which are valuable, special and unique assets of Company, the company's business and marketing plans, unpublished financial data and legal matters involving the Company and its personnel, special know-how and intellectual property, license, and royalty agreements, manufacturing and distribution agreements, product costs and pricing, and any other information and things designated by Company as being confidential.

65.     In Section 6 of the Parkin Agreement, Parkin acknowledged and agreed to the duty of loyalty that he owed to Great American.

66.     Section 13 of the Parkin Agreement provides that the contract would be interpreted and enforced in accordance with the laws of the State of Tennessee.

67.     Parkin was assigned a sales territory in the State of Florida where he carried out most of his sales and fundraising activities for Great American.  In that territory, Parkin was the "face of Great American" and Great American's primary point of contact with Great American's accounts, fundraising program sponsors, program participating parents and students, associated parent organizations, and members of their communities.

68.     Parkin was one of Great American's top producers in sales rankings.  For example, Parkin facilitated fundraising programs for Great American's accounts that generated hundreds of thousands of dollars in net wholesale revenues for schools and other groups.

69.     During the course of his employment, Great American paid Parkin a considerable amount of compensation in the form of salary, bonuses, and business allowances.  From 2013 to 2016, Parkin's average earnings per year exceeded $160,000. During his employment, Parkin additionally received significant benefits each year through his participation in, among other things, the following Great American offerings: health insurance, life insurance, participation in Great American's stock program with dividends, a 401k and Profit Sharing Plan, incentive trips, awards, mentorship by experienced sales representatives recognized as among the best in fundraising, and paid vacation.

70.     In connection with his employment with Great American, Parkin was provided access to and was entrusted with Great American's trade secrets and other confidential information as outlined above.

71.     During the latter years of his employment with Great American, Parkin had

support staff at Great American's corporate headquarters in Nashville, Tennessee

produce training films for use by Parkin and others for Great American's benefit.

72.     During December 2015, just one month before he left the employ of Great

American, Parkin contacted support staff in Great American's corporate headquarters and

requested and did receive a copy of Great American's proprietary training films he had

produced, not telling the support staff that he was imminently leaving Great American to

join a direct competitor. Those materials are property belonging to Great American, and

Parkin has not returned those training materials to Great American although he has been

requested in writing to do so.

73.     Following his resignation, Great American sent Parkin a letter on April 10,

2017, reminding him of his obligations under, among other things, the Parkin Agreement,

including his obligation not to disclose Great American's trade secrets and other

confidential information.  A true and correct copy of that letter is attached hereto as

Exhibit G.

74.     Since his resignation from Great American and joining Cherrydale, Parkin

has directly and through others contacted and solicited multiple schools in Florida on

behalf of Cherrydale

**Defendant Mills**

75.     Mills was employed by Great American from January 22, 2012 to May 4,

2017, when he voluntarily resigned.

76.     Mills worked for Great American as a sales representative and was tasked with exercising his best efforts to promote and solicit the maximum number of sales of products and services offered by Great American in fundraising and to service Great American's accounts in furtherance of achieving goals set by Great American.

77.     At the start of his employment, Mills was required to execute Great American's Employment Agreement that was in place at the time, a true and correct copy of which is attached hereto as Exhibit D (the "Mills Agreement").

78.     In Section 5(b) of the Mills Agreement, Mills agreed and covenanted that for a period of 18 months following the end of his employment, he would not:

> [S]olicit or engage in the solicitation of any customer, account, or sponsor of the Company involved in fundraising with respect to whom, at any time during the three (3) years preceding the termination of Employee's employment with the Company with or without cause: (i) Employee performed services on behalf of the Company; (ii) Employee solicited to do business in fundraising; and/or (iii) Employee acquired or had access to any Confidential Information relating to such customer, account or sponsor as a result of Employee's employment with the Company.

79.     In Section 5(d) of the Mills Agreement, Mills further agreed and covenanted that for a period of 18 months following the end of his employment he would not:

> [E]ngage in competitive business activity with the Company in connection with fundraising for schools and civic organizations in the counties of the states of the continental United States which contain Territory assigned to and/or sold in by Employee for the Company, in an executive, sales, marketing, and/or business development capacity, for Employee's own business enterprise or for the commercial benefit of any third party, to the fullest extent allowed by applicable law.

Case 3:17-cv-01022   Document 1   Filed 07/11/17   Page 19 of 44 PageID #: 19

80. In Section 4(b) of the Mills Agreement, Mills agreed to the confidential nature of the information that was provided to him in the course of his employment, and he agreed "not to access, possess, use, disclose, alter, transfer and/or share any Confidential Information for any reason or purpose other than to carry out faithfully [his] duties for the Company . . . ."

81. Section 4(a) of the Mills Agreement defines "confidential and proprietary" as including:

> [W]ithout limitation, lists and particularized information relative to business and marketing plans; costs, margins, pay plans, and other internal financial items; sponsors, customers, and vendors/suppliers; sales reps and other personnel; systems and the administration thereof; and, special know-how, trade secrets and other property interests of the Company, its parent and related entities.

82. In Section 6 of the Mills Agreement, Mills acknowledged and agreed to the duty of loyalty that he owed to Great American.

83. Section 14 of the Mills Agreement provides that the contract would be interpreted and enforced in accordance with the laws of the State of Tennessee.

84. Mills was assigned a sales territory in the State of Virginia where he carried out most of his sales and fundraising activities for Great American. Prior to his resignation and at his request, Mills was assigned a sale territory in the State of Florida. In that territory, Mills was the "face of Great American" and was the primary point of contact with Great American's accounts, fundraising program sponsors, program participating parents and students, associated parent organizations, and members of their communities.

85.     Mills also was one of Great American's top producers in sales rankings. For example, Mills facilitated fundraising programs for Great American's accounts that generated hundreds of thousands of dollars in net wholesale revenues for schools and other groups.

86.     During the course of his employment, Great American paid Mills a considerable amount of compensation in the form of salary, bonuses, and business allowances. From 2013 to 2016, Mills earned well more than $150,000 per year, on average.  During his employment, Mills additionally received significant benefits each year through his participation in, among other things, the following Great American offerings: employee health insurance, life insurance, participation in Great American's stock program with dividends, a 401k and Profit Sharing Plan, incentive trips, awards, mentorship by experienced sales representatives recognized as among the best in fundraising, and paid vacation.

87.     In connection with his employment with Great American, Mills was provided access to and was entrusted with Great American's trade secrets and other confidential information as outlined above

88.     Since his resignation from Great American and his joining Cherrydale, Mills has directly and through others called and solicited multiple schools in Virginia on behalf of Cherrydale.

**Defendant Francis**

89.     Francis was employed by Great American as a commissioned sales representative from May 3, 2008 to March 31, 2017 when she resigned.

90.     Prior to joining Great American, Francis worked as a sales representative for another business engaged in the marketing, distribution, and sale of candy, gourmet confections, magazines, gift items, and other products in schools and other fundraising channels (the "Prior Employer").  During her employment with the Prior Employer, Francis serviced a number of the Prior Employer's customers in west-central Florida.

91.     Effective April 24, 2008, Great American purchased certain assets of the Prior Employer (the "Asset Purchase"), including, without limitation, all assignable rights under the nondisclosure agreements, non-solicitation agreements, and noncompetition agreements entered between the Prior Employer and its employees, which included Francis.

92.     Great American also acquired the customer accounts of the Prior Employer and goodwill derived therefrom, including the accounts serviced by Francis in the scope of her work duties for the Prior Employer.

93.     Under the terms of her contract with the Prior Employer, Francis acknowledged that the customer-related information relative to the customers and accounts she serviced for the Prior Employer constituted confidential and proprietary information of the Prior Employer.  Great American acquired that confidential and proprietary information as part of the Asset Purchase.

94.     Following the Asset Purchase, Francis worked for Great American as a sales representative and was tasked with exercising her best efforts to promote and solicit the maximum number of sales of products and services offered by Great American in

fundraising and to service Great American's accounts in furtherance of achieving goals set by Great American.

95. At the start of her employment with Great American, Francis was required to execute an Employment Agreement ("Francis Agreement"), a true and correct copy of which is attached hereto as Exhibit E.

96. In Section 4(a) of the Francis Agreement, Francis agreed and covenanted that for a period of 18 months following the end of her employment, she would not:

> [E]ngage, directly or indirectly, in competition against the Company in the capacity of sales, sales management, marketing and/or business development, for the benefit of the Employee or any third party, in connection with the marketing and selling of products and services, (including, without limitation, school, fundraising products and foods, magazine subscriptions and discount cards), to schools and school-affiliated organizations, and civil or religious organizations cited in the Territory or Territories assigned to Employee under this Agreement or any subsequent Agreement, as such may change from time to time.

97. In Section 4(b) of the Francis Agreement, Francis agreed and covenanted that for a period of 18 months following the end of her employment, she would not:

> [D]irectly or indirectly contact or do fundraising business with any account, sponsor, or customer of the Company as to which Employee has received any commission or override in the eighteen months next preceding cessation of Employee's employment with the Company.

98. In Section 5(b) of the Francis Agreement, Francis agreed not to possess, archive, use, disclose or transfer any Confidential Information (as defined in the Francis Agreement) for any purpose other than performing dutifully for Great American.

99. Section 5(a) of the Francis Agreement defines "Confidential Information" as information the confidentiality of which is protected by applicable law in addition to, among other things, the following:

> [Great American's] business and marketing plans … financial data … account information, sponsor contact information, the fundraising goals and [program] histories of the schools and organizations serviced or prospected by [Great American] … executive and managerial compensation and bonuses … competitive strategies and future product and service roll-outs … and special know-how.

100. Section 6 of the Francis Agreement outlines Francis's duty of loyalty owed to Great American and her duty to act in good faith.

101. Section 13 of the Francis Agreement provides that the contract would be interpreted and enforced in accordance with the laws of the State of Tennessee.

102. During her employment with Great American, Francis continued to service many of the customers that she had previously serviced for the Prior Employer and grew that book of business with Great American by prospecting, selling, and servicing additional fundraising accounts in the west-central Florida area.

103. Francis was a top producer for Great American in west-central Florida. For example, Francis facilitated fundraising programs for Great American's accounts that generated hundreds of thousands of dollars in net wholesale revenue for schools and other groups. Francis was the "face of Great American" and the primary point of contact with Great American's accounts, fundraising program sponsors, program participating parents and students, associated parent organizations, and members of their communities.

104.     During the course of her employment, Great American paid Francis a considerable amount of compensation in the form of salary, bonuses, and business allowances.  From 2015 to 2016, Francis' average earnings per year were almost $100,000.  During her employment, Francis additionally received significant benefits each year through her participation in, among other things, the following Great American offerings: employee health insurance, life insurance, participation in Great American's stock program with dividends, a 401k and Profit Sharing Plan, incentive trips, awards, mentorship by experienced sales representatives recognized as among the best in fundraising, and paid vacation.

105.     In connection with her employment with Great American, Francis was provided access to and was entrusted with Great American's trade secrets and other confidential information as outlined above

106.     Since her resignation from Great American and her joining Cherrydale, Francis has directly and through others made sales calls to and solicited multiple schools in Florida that she had serviced while employed at Great American.

**D.     Great American's Contentious History With Cherrydale**

107.     Great American and Cherrydale are direct competitors in the fundraising industry.  Great American and Cherrydale have a long and contentious history, which has included litigation remarkably similar to this case.

108.     Great American filed a lawsuit against Cherrydale's predecessor company in the Chancery Court of Delaware (the "Cherrydale Litigation"), seeking both injunctive relief and monetary damages.  Similar to this case, Great American sued Cherrydale's

predecessor company for a) injunctive relief, b) tortious interference with contract, c) tortious interference with prospective contractual relations, d) aiding and abetting breach of contract/agency, e) unfair competition, and f) misappropriation of trade secrets. Also similar to this case, Cherrydale's predecessor company aggressively recruited a number of salespeople (who were expected to come from an entity that Great American was acquiring) and induced them to join Cherrydale's predecessor company. Also similar to this case, Cherrydale's predecessor company induced salespersons to breach their contractual obligations, placing at risk the security and value of certain trade secrets and other confidential business information.

109.    The trial court entered a preliminary injunction against Cherrydale's predecessor company, restraining it from further using Great American's confidential and proprietary information (including customer information), utilizing Great American's trade secrets in any way, assigning a sales representative from working on Great American's accounts, and having certain of its sales representatives solicit or contact sales representatives of another company whose assets had been acquired by Great American.

110.    Great American prevailed at a bench trial. Sometime after the bench trial, Cherrydale's predecessor company was found to be in contempt for violating the preliminary injunction, and the Court awarded Great American attorney's fees of more than $450,000. Since Cherrydale's predecessor company later filed for receivership and ceased doing business, the court dissolved the preliminary injunction.

111.    Great American submits that Cherrydale—the company that emerged out of the receivership proceedings—has re-commenced a similar pattern of wrongful conduct to unfairly compete and injure Great American.

**E.     Cherrydale's Raiding of Great American's Employees**

112.    In recent months, Cherrydale has been recruiting key productive sales leaders and sales representatives of Great American, including, without limitation, the Individual Defendants.  Upon information and belief, Cherrydale's recruitment is intended to provide it with access to Great American's customers, customer information, and other trade secrets and confidential business information to enable Cherrydale to unfairly compete against Great American.

113.    On March 29, 2017, Ulloa resigned from Great American.  At that time, Ulloa told Great American's President that he was leaving Great American to join Cherrydale.  Upon information and belief, Ulloa currently is employed by Cherrydale in a sales management capacity in direct breach of his covenant not-to-compete that is set forth in the Ulloa 2015 Agreement.  In that regard, Ulloa's LinkedIn page, which is attached hereto as Exhibit H, states that from April 2017 to the present, he has been employed as Cherrydale's Vice President of Strategy and Administration.

114.    On April 12, 2017, Great American's counsel sent a letter to Cherrydale's president, Ross Cherry, advising Mr. Cherry of the restrictions in Ulloa's Employment Agreement.  A true and correct copy of that letter is attached hereto as Exhibit I.  To date, neither Mr. Cherry nor any other representative of Cherrydale has responded to that letter.

115.     On January 23, 2017, Parkin resigned from Great American.  Upon information and belief, Parkin is also employed by Cherrydale in a sales capacity in direct breach of the covenant not-to-compete that is set forth in the Parkin Agreement.  In that regard, Parkin's LinkedIn page, which is attached hereto as <u>Exhibit J</u>, states that from January 2017 to the present, he has been employed as Cherrydale's Director of Business Development.

116.     On May 4, 2017, Mills also resigned from Great American.  Upon information and belief, Mills is also employed by Cherrydale in a sales capacity in direct breach of the covenant not-to-compete that is set forth in the Mills Agreement.

117.     On March 31, 2017, Francis also resigned from Great American.  Upon information and belief, Francis is also employed by Cherrydale in a sales capacity in direct breach of the covenant not-to-compete that is set forth in the Francis Agreement. In that regard, Francis' LinkedIn page, which is attached hereto as <u>Exhibit K</u>, states that from May 2017 to the present, she has been employed as Cherrydale's Director of Sales.

118.     Upon information and belief, the Individual Defendants are soliciting and intend to solicit Great American's customers and potential customers, also in direct breach of the covenants set forth in their respective Employment Agreements.

119.     Prior to Parkin's resignation from Great American, Cherrydale had little or no presence in the Florida schools he and other Great American representatives serviced in the Florida area.  Since Parkin joined Cherrydale, however, Cherrydale's solicitation of schools in the area (which, upon information and belief, previously had been focused primarily on choir and fine arts programs) has increased significantly.  Moreover, some

of Parkin's former accounts in Florida have made reference to "Matt's new company" or "Matt at Cherrydale" when talking about the company with whom they might work with in the coming year.

120.    On multiple occasions following his resignation in May 2017, Mills has been seen coming out of schools in Virginia that have been Great American accounts. Among others, Mills has visited the following Richmond, Virginia schools: Manchester Middle School and Brookland Middle School.  Additionally, Mills participated in a sales pitch to Tuckahoe Middle School, a former Great American account, which Great American was attempting to re-sign for the upcoming school year.

121.    As recently as late June to early July 2017, Francis has called on a number of schools that she previously serviced for Great American for the purpose of diverting their fundraising business away from Great American and to Cherrydale.  Among others, Francis has solicited Gulf Highlands Elementary School and Shady Hills Elementary School, which are both schools in Florida that Francis previously serviced while working for Great American.  Francis has also caused other Cherrydale representatives to solicit the customers she previously serviced for Great American, with those Cherrydale representatives advising Great American's customers and others: "I am here for Becky" or words to that effect.

122.    Upon information and belief, the Individual Defendants are using and intend to use Great American's trade secrets and other confidential information as outlined above in competition with Great American, also in direct violation of the terms of their Employment Agreements and the terms of the DTSA and Tennessee's TSA.

123.    Having had access to and being armed with Great American's trade secrets and other confidential business information, the Individual Defendants are now in a unique position to assist Cherrydale in unfairly competing against Great American.

124.    Ordinarily, a company such as Cherrydale would have to expend a considerable amount of time and effort to identify potential customers, identify and develop personal relationships with key contacts at those customers, determine whether those customers have a fundraising need, identify, develop, and implement tailored fundraising programs for those customers, develop detailed pricing programs for those customers, and determine and track the profitability of those programs and those customer relationships.

125.    Armed with Great American's trade secrets, however, the Individual Defendants are in a position to provide Cherrydale with an enormous head start.  With the assistance of the Individual Defendants, Cherrydale now knows the identity of the most profitable customers, has built-in personal relationships with the key contacts at those customers, knows the customers' needs and the details of prior programs, and can match or even undercut Great American pricing.  Upon information and belief, Defendants are in the process of doing exactly that.

126.    In addition, upon information and belief, during and after he resigned from Great American, at least Ulloa has contacted active sales representatives of Great American in an effort to convince those employees to leave their employment with Great American and join Cherrydale.  Such conduct not only violates the terms of the Ulloa

2015 Agreement, but also constitutes an intentional interference with Great American's contractual and business relationships with its existing employees.

127.    Since no later than April 12, 2017, Cherrydale has been aware of the Ulloa 2015 Agreement and the terms of that agreement.  Upon information and belief, Cherrydale was and continues to be aware of the remaining Individual Defendants' Employment Agreements and the terms of those agreements, including the covenants not-to-compete and the restrictions on the use of Great American's trade secrets and other confidential information.

128.    Upon information and belief, Cherrydale was and continues to be aware of the Individual Defendants' breaches of their respective Employment Agreements and other wrongful conduct, including their breaches of the covenants not-to-compete and their unauthorized and improper use of Great American's trade secrets.

129.    Upon information and belief, Cherrydale nonetheless has encouraged, aided, assisted, and participated in the Individual Defendants' acts of breaching their Employment Agreements and engaging in other wrongful conduct.  Indeed, upon information and belief, Cherrydale encouraged the Individual Defendants to leave their employment with Great American and become employed by Cherrydale for the very purpose of having the Individual Defendants solicit Great American's customers, exploit their relationships with those customers, and use Great American's trade secrets and other confidential information in an effort to transfer the business of those customers from Great American to Cherrydale.

**(Actual and Threatened Misappropriation of Trade Secrets
in Violation of DTSA against All Defendants)**

130.    The foregoing paragraphs are hereby incorporated by reference.

131.    Great American is the owner of certain trade secrets within the meaning of
the DTCA, 18 U.S.C. § 1839(3).

132.    During their employment, Great American provided the Individual
Defendants with access to Great American's trade secrets and other confidential business
information as discussed herein to facilitate the performance of their jobs and in
furtherance of Great American's business.  Great American placed great trust and
confidence in the Individual Defendants to protect and to not use those trade secrets and
other confidential business information, except for the sole purpose of benefiting Great
American, as was specified in their respective Employment Agreements.

133.    The trade secrets and confidential business information described herein
derives independent economic value, actual or potential, from not being generally known
to, and not being readily ascertainable through proper means by, another person who
could obtain economic value from the disclosure or use of the information.  Such
information is also related to products and services that are used or intended for use in
interstate commerce.

134.    The information described herein constitute trade secrets subject to the
protection under the DTSA, 18 U.S.C. § 1832, *et seq.*

135.    As described herein, Great American has taken reasonable measures to
keep such information secret.

136. In view of the express terms of their respective Employment Agreements, and based on the experience working for Great American, the Individual Defendants had actual or constructive knowledge that the information described herein and which they obtained during their employment constituted Great American's trade secrets.

137. Based on their participation in the industry, access to the Individual Defendants' Employment Agreements, and the Cherrydale Litigation, among other reasons, Cherrydale also had actual or constructive knowledge that the information described herein and which Cherrydale obtained from the Individual Defendants constituted Great American's trade secrets.

138. Defendants misappropriated Great American's trade secrets. Defendants have used, and continue to use, and intend to use the trade-secrets described herein that they misappropriated from Great American.

139. Without authorization, Defendants printed, downloaded, emailed, transmitted, communicated, conveyed and/or otherwise possess Great American's trade secrets.

140. Defendants are in possession of Great American's trade secrets, knowing they were stolen or appropriated, obtained, or converted without authorization.

141. Despite requests to return Great American's trade secrets, Defendants have refused to do so.

142. As a result of Defendants' unlawful conduct, Great American has suffered and will continue to suffer damages including lost revenue and profits, loss of

competitive advantage, loss of the value of its trade secrets, loss of business goodwill, and harm to its reputation.

143.    By engaging in the actions described above, Defendants have violated the DTSA, 18 U.S.C. §§ 1831-1839.

144.    The harm suffered by Great American is continuing and cannot be compensated by money damages alone; and thus, Great American is entitled to, among other things, monetary damages and injunctive relief under the DTSA.

145.    Great American is also entitled to an award of its attorney's fees.

## COUNT II
**(Actual and Threatened Misappropriation of Trade Secrets in Violation of the Tennessee's Trade Secrets Act against All Defendants)**

146.    The foregoing paragraphs are hereby incorporated by reference.

147.    Great American is the owner of certain trade secrets within the meaning of Tennessee's TCA, Tenn. Code Ann. § 47-25-1701, *et. seq*.

148.    The trade secrets have independent economic value and are entitled to protection.

149.    Great American has undertaken reasonable and considerable efforts to maintain the confidentiality and secrecy of its confidential, proprietary, and trade secret information.

150.    Defendants possess Great American's trade secret information as described herein.

151.    Great American's confidential, proprietary and trade secret information derives independent economic value (actual or potential) from not being generally known

to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from the disclosure or use of this information.

152.     Great American's trade secret information gives Great American a competitive advantage in the marketplace.

153.     Defendants have a statutory duty to keep secret, and not to disclose or use, the trade secrets of Great American.

154.     Defendants have improperly used Great American's trade secrets, including, but not limited to, secrets regarding Great American's customers, preferences, pricing, marketing information, and details about its relationships with its customers.

155.     Defendants have caused injury to Great American in violation of Tennessee's TCA.

156.     Defendants' conduct has caused and will continue to cause immediate, irreparable harm to Great American for which Great American has no adequate remedy at law.  Pursuant to Tenn. Code Ann. § 47-27-1703, Great American is entitled to an injunction enjoining Defendants, and each of them, from contacting any of Great American's customers or prospective customers, and otherwise using any of Great American's trade secret information.

157.     In addition, Defendants should be ordered to return all originals and copies of Great American's property to Great American.

158.     Defendants' aforementioned acts were and are willful, malicious, and fraudulent.  Great American therefore is entitled to exemplary damages under Tenn. Code Ann. § 47-27-1704(b).

159.     Pursuant to Tenn. Code Ann. § 47-27-1705, Great American is entitled to an award of attorneys' fees for Defendants' bad-faith misappropriation of trade secrets.

<u>**COUNT III**</u>
**(Breach of Contract against the Individual Defendants)**

160.     The foregoing paragraphs are hereby incorporated by reference.

161.     The Employment Agreements between Great American and the Individual Defendants serve Great American's interest in protecting its trade secrets and other confidential information and in safeguarding against unfair competition.

162.     The restraints imposed by the Employment Agreements are reasonably tailored to protect Great American's legitimate business interests.

163.     The Individual Defendants have breached their respective Employment Agreements by, among other things, engaging in a business in direct competition with Great American, soliciting Great American's customers, and using Great American's trade secrets.

164.     By signing their Employment Agreements, the Individual Defendants knew they had a duty to maintain the secrecy of Great American's trade secrets, to return all of Great American's trade secrets in their possession, custody or control when their employment with Great American ended; and to refrain from using Great American's trade secrets for any reason other than for the benefit of Great American.

165.     Great American has and will suffer irreparable harm by virtue of the Individual Defendants' breach of their Employment Agreements, use of confidential

customer, marketing, pricing and business information, as well as Great American's goodwill and reputation in the industry.

166. All conditions precedent for the enforcement of each Employment Agreement have been satisfied.

167. As a direct and proximate result of the Individual Defendants' breaches of the Employment Agreements, Great American has suffered and will suffer monetary and irreparable harm.

168. Great American will suffer substantial, immediate, and irreparable harm and damages unless the Individual Defendants are enjoined from further breaching their Employment Agreements.

## COUNT IV
### (Procurement of Breach of Contract against Cherrydale Pursuant to Tenn. Code Ann. § 47-50-109)

169. The foregoing paragraphs are hereby incorporated by reference.

170. Cherrydale was aware of the Employment Agreements between Great American and the Individual Defendants through its participation in the fundraising marketplace, recruitment of the Individual Defendants, and the 2008 Litigation.

171. By recruiting Great American's employees and coopting Great American's trade secrets and confidential information, Cherrydale intended to and did induce the Individual Defendants' breaches as described herein and acted maliciously in doing so.

172. The Individual Defendants have breached their respective Employment Agreements by, among other things, engaging in a business in direct competition with

Great American, soliciting Great American's customers, and using Great American's trade secrets.

173. Cherrydale encouraged, aided, assisted, and participated in the Individual Defendants' acts of breaching their Employment Agreements and engaging in other wrongful conduct. Cherrydale's conduct proximately caused the Individual Defendants to breach their Employment Agreements with Great American.

174. Great American has suffered and will continue to be damaged in the marketplace through lost sales and the utilization of its trade secrets and confidential information against it, in an amount to be proven at trial.

175. Great American will suffer substantial, immediate, and irreparable harm and damages unless Cherrydale is enjoined from further acts of aiding and abetting the Individual Defendants' breaches of the Employment Agreements.

## COUNT V
### (Breach of Fiduciary Duty against the Individual Defendants)

176. The foregoing paragraphs are hereby incorporated by reference.

177. As employees of Great American who were entrusted with trade secrets and other confidential business information, the Individual Defendants owed Great American at all times a fiduciary duty, which included a duty of loyalty, and were to act solely for the benefit of Great American in matters within the scope of their employment.

178. By the acts complained of, the Individual Defendants violated the fiduciary duty they owed to Great American.

179.    The Individual Defendants' conduct has caused Great American to suffer monetary damages in an amount to be determined at trial.

180.    The Individual Defendants' conduct also has caused and will continue to cause Great American to suffer irreparable harm for which there is no adequate monetary compensation.

181.    The Individual Defendants have acted maliciously, intentionally, fraudulently, or recklessly warranting an award of punitive and exemplary damages.

## COUNT VI
### (Aiding and Abetting Breach of Fiduciary Duty against Cherrydale)

182.    The foregoing paragraphs are hereby incorporated by reference.

183.    Great American and the Individual Defendants enjoyed a fiduciary relationship with one another, as evidenced by the disclosure of confidential information and contractually defined duty of loyalty, amongst others.  The Individual Defendants similarly owed a common law fiduciary duty to Great American under Tennessee common law.

184.    The Individual Defendants breached their fiduciary duties to Great American by misappropriating trade secrets and confidential information and disclosing such information and know-how to Cherrydale and/or other competitors in the fundraising marketplace.

185.    Cherrydale knowingly participated in and aided and abetted this breach by heavily recruiting the Individual Defendants and using Great American's confidential information and trade secrets for its own benefit in the marketplace.

186.    Cherrydale's substantial assistance and encouragement directly and proximately caused Great American substantial damages resulting from the breaches of fiduciary duties, unjustly enriching Cherrydale in an amount to be determined at trial.

187.    As a result of Cherrydale's conduct, Great American has sustained, and will continue to sustain, actual damages in an amount to be proven at trial.

188.    Cherrydale has acted maliciously, intentionally, fraudulently, or recklessly warranting an award of punitive and exemplary damages.

## COUNT VII
**(Tortious Interference with Contract against Cherrydale)**

189.    The foregoing paragraphs are hereby incorporated by reference.

190.    Prior to their resignation, Great American had contractual and economic relationships with the Individual Defendants.  At all relevant times, Cherrydale was fully aware of those relationships.

191.    Cherrydale wrongfully interfered with Great American's existing contractual relationships with the Individual Defendants by intentionally raiding Great American and encouraging the Individual Defendants to breach their employment obligations and duties to Great American, knowing full well that doing so would benefit Cherrydale at Great American's expense.

192.    Cherrydale interfered with the Individual Defendants' employment relationships with Great American knowingly and with the intent to have the Individual Defendants' terminate their employment with Great American.  These acts have caused

and continue to cause Great American to suffer economic damages proximately caused by the intentional interference.

193.    These acts by Cherrydale have also caused and, unless enjoined, will continue to cause irreparable damage to Great American in the form of loss of good will, loss of competitive advantage, loss of technology and technical knowledge, loss of relationships with clients and employees, loss of business known-how, for which Great American has no adequate remedy at law.

## COUNT VII
**(Tortious Interference with Business Relationships against All Defendants)**

194.    The foregoing paragraphs are hereby incorporated by reference.

195.    Defendants were aware, or should have been aware, of the existence of ongoing business relationships between Great American and its customers and prospective customers.

196.    Great American has business expectancies with its customers and prospective customers, upon which it reasonably expects to profit.

197.    Defendants knew of these actual and prospective contractual relationships and other business expectancies between Great American and its customers and prospects, as well as the actual and anticipated profits associated therewith.

198.    Defendants have wrongfully, improperly and maliciously interfered with these actual and anticipated contractual relationships and other business expectancies to aid, assist, and encourage customers and prospects of Great American to refrain from doing business with it.

199.     Defendants' wrongful, improper, and malicious interference with these

actual and anticipated contractual relationships and other business expectancies has

caused and will continue to cause harm to Great American's business in a substantial and

irreparable way.  Such harm includes, but is not limited to, Great American's loss of

customers and prospects and business relationships and good will.

200.     If not enjoined, Defendants' interference with Great American's contractual

relationships and business expectancies will continue to harm Great American and,

therefore, Great American's business in a substantial and irreparable way.

## PRAYER FOR RELIEF

WHEREFORE, Great American requests that it be granted the following relief as

to Defendants, and each of them:

(1)     awarding judgment an amount to be proven at trial on all claims asserted;

(2)     preliminary and permanent injunctive relief prohibiting Defendants from

using, disclosing or misappropriating trade secret, proprietary and/or

confidential information belonging to Great American;

(3)     preliminary and permanent injunctive relief prohibiting the Individual

Defendants from any further breaches of their Employment Agreements,

including the non-competition and non-solicitation provisions of those

agreements;

(4)     all actual, consequential, special, liquidated and exemplary damages as may

be provided by law or contract;

(5)     its costs and reasonable attorneys' fees as provided under the Employment

        Agreements, 18 U.S.C. §§ 1836 (b); Tenn. Code Ann. § 47-25-1705; and/or

        other applicable law;

(6)     prejudgment, post judgment and other interest as permitted by law; and

(7)     such other and further relief as the Court deems appropriate.


                        Respectfully submitted,


                        /s/Michael R. O'Neill
                        Samuel P. Funk (No. 19777)
                        Michael R. O'Neill (No. (#34982)
                        SIMS|FUNK, PLC
                        3310 West End Avenue, Suite 410
                        Nashville, Tennessee 37203
                        (615) 292-9335
                        (615) 649-8565 (fax)
                        sfunk@simsfunk.com
                        moneill@simsfunk.com

                        *Counsel for Plaintiff Great American*
                        *Opportunities, Inc.*

## VERIFICATION

I, Kevin Hawley, declare as follows:

I am the president of Great American Opportunities, Inc. ("Great American"). I have reviewed Great American's foregoing Verified Complaint. Except as to those matters alleged on information and belief, I verify that the facts set forth above are true and correct based upon my information, personal knowledge and belief, including information gathered from Great American's documents that were prepared and maintained in the ordinary course of the company's business and/or Great American's employees who have personal knowledge of the facts asserted.

I declare under penalty of perjury under the laws of the State of Tennessee that the foregoing is true and correct to the best of my knowledge. Executed this 10th day of July, 2017 at Nashville, Tennessee.

Kevin Hawley

Case 3:17-cv-01022   Document 1   Filed 07/11/17   Page 44 of 44 PageID #: 44