**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **GREAT AMERICAN** | ) | |
| **OPPORTUNITIES, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **NO. 3:17-cv-01022** |
| | ) | |
| **v.** | ) | **JUDGE CAMPBELL** |
| | ) | **MAGISTRATE JUDGE** |
| **CHERRY BROS., LLC d/b/a** | ) | **NEWBERN** |
| **CHERRYDALE FARMS, RENE** | ) | |
| **ULLOA, MATTHEW L. PARKIN,** | ) | |
| **TODD ALLEN MILLS, REBECCA** | ) | |
| **FRANCIS, and STEVEN B. CLONTS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the Court is Plaintiff's/Counterdefendants' Joint Motion to Dismiss Individual Defendants' First Amended Counterclaim (Doc. No. 259). The Defendants/Counterplaintiffs Rene Ulloa and Rebecca Francis responded jointly to the Motion to Dismiss (Doc. No. 271) and Plaintiff/Counterdefendants filed a joint reply (Doc. No. 273). For the reasons discussed below, the Motion to Dismiss is **GRANTED** in part and **DENIED** in part.

## I.      FACTUAL BACKGROUND

Great American Opportunities, Inc. ("Great American") brought suit against Mr. Ulloa, Ms. Francis and other former employees and their new employer, Cherry Brothers, LLC, alleging claims of breach of employment agreements, misappropriation of trade secrets, and other related claims. (Doc. Nos. 1 and 51.)  Rebecca Francis and Rene Ulloa brought counterclaims related to the purchase of company stock against Great American and its parent company, Southwestern/Great American Inc. ("Southwestern"), collectively (the "Companies"). (Doc. Nos.

251 and 252.) Great American and Southwestern move to dismiss those counterclaims for failure to state a claim. Fed. R. Civ. P. 12(b)(6). (Doc. No. 260.) The Court limits its discussion of the facts to those necessary to address the Counterclaims.

Ms. Francis and Mr. Ulloa worked for Great American as sales representatives. (Doc. No. 251 at ¶ 6; Doc. No. 252 at ¶ 6.) Ms. Francis was employed by Great American from 2008 until she resigned in 2017. (Doc. No. 251 at ¶ 6.) Mr. Ulloa worked for Great American from 2004 until his resignation in 2017. (Doc. No. 252 at ¶ 6.) In connection with their employment, they each signed Employment Agreements. (Doc. No. 251 at ¶ 77; Doc. No. 252 at ¶ 77; Doc. No. 1, Exs. A, B, E.) During each of their first years of employment, Ms. Francis and Mr. Ulloa allege that they were offered participation in the Southwestern Stock Plan, that company representatives told them the stock value was "nearly guaranteed," and that by investing in the stock plan they would retire as multi-millionaires. (Doc. No. 251 at ¶ 7-8; Doc. No. 252 at ¶ 7-8.) They allege that company representatives compared stock in Southwestern to that of Berkshire Hathaway, Inc. (*Id.*)

For each year of the stock plan, Southwestern issued a Private Offering Memorandum setting forth the terms of investment and participants in the stock plan signed an Option Agreement and a Subscription Agreement (together, the "Plan Documents."). (Doc. No. 251 at ¶ 9-10; Doc. No. 252 at ¶9-10; *also see* Doc. Nos. 260-261, Exs. A-N.) Great American and Southwestern have filed copies of the relevant Private Offering Memoranda and the Subscription Agreements and Option Agreements signed by Mr. Ulloa.[1] (Doc. Nos. 260-261, Exs. A-N.)

---

[1]Ms. Francis says "it is not clear" whether she received the Plan Documents each year or whether she executed copies of the Option Agreement or the Subscription Agreement. (Doc. No. 251 at ¶13.) Mr. Ulloa states that he received the 2004 Private Placement Memorandum (Doc. No. 252 at ¶19), and the Companies filed additional Plan Documents signed by Mr. Ulloa for plan years 2004, 2005, 2006, and 2012. (*See* Doc. No. 260, Exs. A, B, C, E; Doc. No. 261, Exs. G-N.)

The Option Agreement and Subscription Agreement, which are identical in relevant part for each of the plan years, bind the parties to the terms of the Private Offering Memorandum and acknowledge that the shareholder has received and read the Private Offering Memorandum. The Option Agreements state: "The Option and the Shares shall be subject to, and the Company and the Optionee agree to be bound by, all of the terms and conditions of the Plan …" The Subscription Agreements state: "The Subscriber has received and read the Confidential Offering Memorandum …" (Doc. No. 260, Exs. G-N.)

The Private Offering Memoranda include the following relevant statements, which are identical for each plan year (Doc. No. 261, Exs. A-F):

- No person is authorized to give any information or to make any representation not contained in this memorandum. Except as set forth herein, no written offering literature or advertising has been authorized. Any information or representation not contained herein must not be relied upon as being authorized.

- The Option Holder acknowledges that no person has represented, directly or indirectly, the amount, percentage, or type of profit or loss to be realized, if any, from investment in the Shares.

- The Stock Option Plan will be administered by the Company's board of directors …. Subject to the terms and conditions of the Stock Option Plan, the Board will have the sole authority to interpret and implement the Stock Option Plan.

- If for any reason (including death or disability), an Option holder's employment with the Company is terminated, whether by the Option holder or by the Company, the Company shall have the option to purchase, but is not required to purchase, the Shares of the Option holder.

- Upon termination of the Investor's employment for any reason (including death or disability), the Company, at its option, can purchase all or any portion of the Shares acquired by the Investor pursuant to the Options.

Mr. Ulloa represents that he invested over $100,000 in the stock plan and Ms. Francis represents that she invested between $25,000 and $30,000 in the stock plan. (Doc. 251 at ¶ 35; Doc. No. 252 at ¶ 35.)  Mr. Ulloa and Ms. Francis allege that they voluntarily resigned from Great American at the end of March 2017. (Doc. 251 at ¶ 36; Doc. No. 252 at ¶ 36.)  Each of them requested that Southwestern redeem their stock. (*Id.*)

Mr. Ulloa and Ms. Francis claim that Southwestern would only repurchase the stock if they each agreed to terms of a conditional promissory note, pursuant to which Southwestern would pay the proceeds from the stock, plus interest, over a period of years.  Payments pursuant to the promissory note could be terminated if the Companies determined that the stock holder (1) disparaged the Companies or their affiliates; (2) obtained an unfair advantage or wrongfully competed against the Companies; (3) wrongfully interfered with the Companies' customers or other business relations; (4) caused any salesperson, manager, officer, director, independent contractor, supplier, or vendor to sever or alter his/her business relations with the Companies; or (5) violated any contractual obligations owed to the Companies. (Doc. 251 at ¶ 37-38; Doc. No. 252 at ¶ 37-38.)

Mr. Ulloa and Ms. Francis claim that the decision not to repurchase their stock was made by "an insular, self-interested group of executives" with a purpose "to coerce, intimidate, and punish a departing employee who wants to work for a … competitor" and not for any legitimate business reason. (Doc. No. 251 at ¶¶ 24, 31; Doc. No. 251 at ¶¶ 24, 31.)

In July 2017, Great American and Southwestern filed a Complaint against Mr. Ulloa, Ms. Francis, and others, alleging claims of breach of employment agreements, misappropriation of trade secrets, and other related claims. (Doc. Nos. 1 and 51.) Mr. Ulloa and Ms. Francis individually filed Amended Counterclaims on July 23, 2018, alleging fraud, conversion, unjust enrichment, breach of contract, and violations of the Tennessee Consumer Protection Act ("TCPA"), the Tennessee Securities Act, the Securities and Exchange Act, and the Racketeer Influenced and Corrupt Organizations ("RICO") Act. (Doc. Nos. 251, 252.) Great American and Southwestern jointly move to dismiss all counterclaims. (Doc. No. 259.)

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint for failure to state a claim upon which relief can be granted. For purposes of a motion to dismiss, a court must take all the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*.  In reviewing a motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff.  *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

In considering a Rule 12(b)(6) motion, the Court may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to Defendant's motion to dismiss so long as they are referred to in the Complaint and are

central to the claims.  *Bassett v. National Collegiate Athletic Assn.*, 528 F.3d 426, 430 (6th Cir. 2008).

The Companies have included the following plan documents as exhibits to their Joint Motion to Dismiss: the Private Offering Memoranda (Exs. A-F); the Option Agreements signed by Mr. Ulloa (Exs. G, I, K, and M); and the Subscription Agreements signed by Mr. Ulloa (Exs. H, J, L, and N) (together the "Plan Documents").  The Plan Documents are referenced by both Mr. Ulloa and Ms. Francis in their First Amended Complaints and are central to the claims presented, therefore, the Court will consider them in evaluating the Motion to Dismiss.

However, the Companies have only presented Plan Documents signed by Mr. Ulloa.  Ms. Francis claims that she may not have received the Plan Documents. (Doc. No. 251 at ¶¶ 13-19.) For purposes of a Motion to Dismiss, the Court assumes the factual allegations in the Complaint are true.  Therefore, in so far as it benefits Ms. Francis's claims, the Court will assume that she has not signed the Plan Documents and is unaware of their content.

## III.    ANALYSIS

### A.  Securities Fraud

Mr. Ulloa and Ms. Francis assert claims for fraud-based violations of the Tennessee Securities Act of 1980, TENN. CODE ANN. §§ 48-1-121, and the Securities and Exchange Act of 1934, 15 U.S.C. § 78j, arising from alleged misrepresentations regarding the stock plan. Specifically they allege (1) that the Plan Documents misstate that the stock plan will be administered by the Board of Directors when in fact a smaller group of executives decide whether to redeem stock; and (2) that the Plan Documents omitted material information about Southwestern's "secret policy" regarding stock repurchase.

Tennessee state securities law mirrors the federal law. *Bass v. Janney Montgomery Scott, Inc.*, 152 F.App'x 456, 459 (6th Cir. 2005). To state a claim under both the Tennessee Securities Act and the Securities and Exchange Act, a party must allege "(1) a misrepresentation or omission (2) of a material fact (3) made with scienter (4) justifiably relied upon … (5) proximately causing (6) damage." *Id*. The misrepresentation or omission must be of a material fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant. *Basic v. Levinson*, 485 U.S. 224, 238 (1988). Materiality depends on the significance a reasonable investor would place on the withheld or misrepresented information given the "total mix" of information available. *Id*. at 232 and 240. The issue of materiality is a mixed question of law and fact. *Helwig v. Vencor*, 251 F.3d 540, 564 (6th Cir. 2001) (citing *TSC Indus., Inc. v. Northway, Inc.* 426 U.S. 438, 450 (1976)). A complaint may not be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance. *Id*.

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must state with particularity facts giving rise to a "stong inference" that the defendant acted with "scienter," which is a mental state embracing intent to deceive, manipulate, or defraud. *Matrixx Initiatives, Inc. v. Siracusana*, 563 U.S. 27, 29 (2011). To determine if a complaint adequately pleads scienter, the Court shall review all of the allegations holistically. Scienter is adequately pleaded if a reasonable person would deem the inference of scienter at least as compelling as any opposing inference one could draw from the facts alleged. *Id*. (finding a reasonable inference of scienter when the facts "taken collectively" warranted an inference that the defendant did not disclose information, not because

it believed the information was meaningless, but because it understood the likely effect on the market.)

### 1. Alleged Misrepresentations About Stock Plan Administration

Mr. Ulloa and Ms. Francis allege that Great American and Southwestern made misrepresentations in the Plan Documents regarding the administration of the stock plan. They claim the representations that "[t]he Stock Option Plan will be administered by [Southwestern's] Board of Directors (the 'Board')" and that "[s]ubject to the terms and conditions of the Stock Option Plan, the Board will have the sole authority to interpret and implement the Stock Option Plan" are false because a smaller group of Southwestern executives decides whether to redeem stock. (Doc. No. 251 at ¶ 41; Doc. No. 252 at ¶ 41).

The Court finds that this is not a material misrepresentation. Applying the materiality standard in *Basic v. Levinson*, a finding of materiality requires that the information, had it been presented accurately, would have affected the "total mix" of information available and that a reasonable investor would have found it significant. *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988). Given the facts alleged, the Court does not conclude that a reasonable investor could have found significant the detail that certain decisions regarding the stock plan were not made exclusively by the entire Board of Directors. Moreover, there is no allegation that the Board of Directors was not, in fact, the plan administrator.

### 2. Alleged Misrepresentations About the Stock Plan Repurchase Policy

Mr. Ulloa and Ms. Francis allege that Southwestern did not disclose its policy not to repurchase stock from terminated employees unless the employees agree to a conditional payout over time which could be terminated if the Company determined that the shareholder had (1) disparaged the Companies or their affiliates; (2) obtained an unfair advantage or wrongfully

competed against the Companies; (3) wrongfully interfered with the Companies' customers or other business relations; (4) caused any salesperson, manager, officer, director, independent contractor, supplier, or vendor to sever or alter his/her business relations with the Companies; or (5) violated any contractual obligations owed to the Companies. (Doc. No. 251 at ¶ 38; Doc. No. 252 at ¶ 38.) They allege that this omission was material, that the policy was a "secret policy" designed to "coerce, intimidate, and punish" departing employees, and that the policy should have been described in the Plan Documents. (Doc. No. 251 at ¶ 31; Doc. No. 252 at ¶ 31.)

The Companies argue that Mr. Ulloa and Ms. Francis were on notice that Southwestern might choose not to repurchase their shares, citing the Plan Documents' provision that "the Company shall have the option to purchase, *but is not required to purchase*, the Shares of the Option holder." (Def. Exs. A-F (emphasis added)).

Applying the *Basic* materiality standard to this claim, the Court might have considered Mr. Ulloa's and Ms. Francis's claims separately because Mr. Ulloa is known to have received the Plan Documents, while Ms. Francis claims that she may not have received them. The consideration of the Plan Documents, particularly the portion stating that Southwestern is not required to purchase shares, affects the "total mix" of information available and, thus may change the significance an investor places on the alleged undisclosed stock payout policy. However, Ms. Francis, though she may not have received the Plan Documents, alleges only that Southwestern should have disclosed *in the Plan Documents* information about the circumstances under which it would repurchase shares. She does not assert she had no information at all about Southwestern's share repurchase policy or obligations. She specifically claims that the Plan Documents contain material omissions. Because her claims in this regard address only what Southwestern should have *added* to the Plan

9

Documents,[2] the Court will consider whether the details of the alleged stock payout policy are material in light of the totality of the information included in the Plan Documents.

The Court finds Mr. Ulloa and Ms. Francis have alleged facts sufficient to establish a claim for securities fraud. They have alleged an undisclosed stock payout policy, the details of which might be material to a reasonable investor considering the "total mix" of information. Given that the purpose of investing in the stock plan was to eventually sell back the stock to Southwestern, if Southwestern had a "secret policy" guiding its stock repurchase decisions, that information might affect a reasonable investor's decision whether to purchase the stock. At this juncture the Court cannot say as a matter of law that it is not material.

The Court further finds, with respect to this allegation, that Mr. Ulloa and Ms. Francis have pleaded with sufficient particularity to satisfy Rule 9 and the PSLRA and that they have stated facts sufficient to give rise to a strong inference of scienter. They allege that the Companies developed this plan and kept it secret in order to "coerce, intimidate, and punish" departing employees and have detailed their own experiences as examples of the alleged policy being implemented. (Doc. No. 251 at ¶ 31; Doc. No. 252 at ¶ 31.) This is sufficient to state a "strong inference" of scienter to survive a motion to dismiss.

For the reasons stated, the Court finds that Mr. Ulloa and Ms. Francis have sufficiently pleaded fraud-based violations of the Tennessee Securities Act of 1980 and the Securities and Exchange Act of 1934 fraud only as to the allegation that the Companies had a secret plan

_____

[2] *See* Francis Complaint (Doc. No. 251) at ¶ 25 ("[Southwestern's Private Placement Memoranda contains [sic] material omissions); ¶ 27 ("It is not disclosed anywhere in the Private Placement Memoranda …Nor is it disclosed anywhere in the Private Placement Memoranda …"); ¶ 31 ("There is more. For instance, the Private Placement Memoranda fail to disclose that … Again, before making an informed decision to invest in the [Southwestern] Stock Plan, any reasonable [Great American] employee would need to know the foregoing material facts, all of which are omitted from the Private Placement Memoranda.")

regarding stock repurchase and that they were obligated to disclose the existence of the plan in the Plan Documents. The Motion to Dismiss the claim of securities fraud, only as to this issue, is **DENIED**. As to all other issues, the Motion to Dismiss the claims of fraud-based violations of securities laws is **GRANTED**.

### B. Common Law Fraud

Complementing their securities fraud claims, Mr. Ulloa and Ms. Francis allege that the Companies' actions constitute fraud under Tennessee's common law. Specifically, they allege claims based on alleged misrepresentations by the Companies' employees about the value of the stock plan, alleged misrepresentations in the Plan Documents regarding the administration of the stock plan, and alleged omissions from the Plan Documents of a secret stock repurchase policy.

To establish a claim for fraud, a plaintiff must allege facts showing that: 1) the defendant made a representation of an existing or past fact; 2) the representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly; 5) plaintiff reasonably relied on the misrepresented material fact; and 6) plaintiff suffered damage as a result of the misrepresentation. *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008).

A claim of fraudulent inducement requires that the misrepresentation be made without the present intention to carry it out. *Power & Tele. Supply Co., Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006) (applying Tennessee law). "Statements of future intention, opinion, or sales talk are generally not actionable because they do not involve representations of material past or present fact." *Id*. (citing *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982)).

Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this requirement, the Complaint, at a minimum must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008). Generalized and conclusory allegations that the Defendants' conduct was fraudulent do not satisfy Rule 9(b). *Bovee v. Coopers & Lybrand*, C.P.A., 272 F.3d 356, 361 (6th Cir. 2001).

### 1. Employee Statements Regarding the Value of the Stock Plan

Mr. Ulloa and Ms. Francis allege that someone at Great American or Southwestern told them that participating in the stock plan was a "highly valuable" investment, that the stock was "nearly guaranteed" to hold its value, and that they would each retire "a multi-millionaire" if they participated in the stock plan. Mr. Ulloa and Ms. Francis claim that these statements were made when they were initially offered the opportunity to participate in the stock plan. For Mr. Ulloa that was sometime in 2004 and for Ms. Francis it was sometime in 2008. They both claim that the statements were made by Great American and Southwestern: "GAO and SW/GA represented that the shares offered to [her/him] under the Stock Plan were highly valuable and that if [she/he] chose to invest in the Stock Plan, [she/he] would 'retire a multi-millionaire.'" (Doc. No. 251 at ¶ 8; Doc. No. 252 at ¶ 8.)

As an initial matter, the Court finds that, with regard to these statements about the value of the stock plan, Mr. Ulloa and Ms. Francis have not met the pleading requirements of Rule 9. First, the complaints do not identify the speaker. The statements are alleged to have been made by both Southwestern or Great American, but not by any specific person or even by a specific entity. Second, the complaints do not state the time and place that the statements were made. Both

complaints allege generally that the statements were made at the time each of the employees were originally offered participation in the stock plan, in 2004 and 2008.  These general allegations do not meet the heightened pleading standards of Rule 9.

Regarding the nature of the statements at issue, statements of opinion or future projections of value are generally not actionable facts that can form the basis of a fraud claim.  *See Power & Telephone Supply Co., Inc.*, 447 F.3d at 930.  Statements that the plan is "highly valuable" are expressions of opinion.  Similarly, projection of the stock plan's long-term worth in vague, hyperbolic terms is both opinion and future projection.  Neither of the statements constitute a misrepresentation of "existing or past fact" necessary to establish a claim of fraud.

Furthermore, with regard to the claims of Mr. Ulloa,[3] the Plan Documents that he acknowledged reading expressly state that participants in the stock option plan may not rely on information related to the plan except as set forth in the Plan Documents.  "No person is authorized to give any information or to make any representation not contained in this memorandum.  Except as set forth herein, no written offering literature or advertising has been authorized.  Any information or representation not contained herein must not be relied upon as being authorized … no person has represented, directly or indirectly, the amount, percentage, or type of profit or loss to be realized, if any, from investment in the Shares." (Doc. No. 261, Exs. A-F.)  Therefore, Mr. Ulloa cannot reasonably claim that Great American or Southwestern intentionally misled him as to the value of the stock plan, given the plan documents that specifically discredit outside information as to the value of the stock plan.

---

[3] Ms. Francis claims it unclear whether she has seen the Plan Documents.  Because this is a Motion to Dismiss, and the Court considers the claims in the light most favorable to the Plaintiff, the Court will assume that Ms. Francis has not reviewed the Plan Documents for purpose of the claim related to statements about the stock plan's value.

### 2. Alleged Misstatements in the Plan Documents About Plan Administration

As discussed with regard to the securities fraud claims, Mr. Ulloa and Ms. Francis allege that Great American and Southwestern made misrepresentations of material fact in the Plan Documents by stating that the stock plan was administered by Southwestern's Board of Directors, when in fact a smaller group of Southwestern executives decide whether to redeem stock.[4]  This could be viewed either as an allegation of a misrepresentation, i.e. the plan was not actually administered by the Board of Directors, or as an omission, i.e. the failure to disclose that a smaller group of executives makes decisions about stock redemption.

Nondisclosure of a material fact may give rise to a claim for fraudulent misrepresentation when the defendant has a duty to disclose and the matters not disclosed are material. *Justice v. Anderson County,* 955 S.W.2d 613, 616 (Tenn. Ct. App. 1997).  A duty to disclose only arises in when there is a fiduciary relation between the parties, where one of the parties expressly reposes a trust and confidence in the other, or there is contract is intrinsically fiduciary. *Shah v. Racetrac Petroleum Co.* 338 F.3d 557, 571 (6th Cir. 2003) (applying Tennessee law).  Absent a fiduciary relationship, Tennessee courts also recognize that between parties to a contract, there is a duty to disclose "material facts affecting the essence of a contract's subject matter." *Odom v. Oliver*, 310 S.W.3d 344, 349 (Tenn. Ct. App. 2009).  "Each party to a contract is bound to disclose to the other all he may know respecting the subject matter materially affecting a correct view of it." *Id*. (citing *Simmons v. Evans*, 206 S.W.2d 295, 296 (Tenn. 1947).

---

[4] Ms. Francis claims that she may not have received the Plan Documents.  Nevertheless, as with her securities fraud claims, her claims are clearly based on the contention that Southwestern made misrepresentations in the Plan Documents and that it should have included additional information in the Plan Documents.  For this reason, the Court has only considered Mr. Francis's allegations that certain information should have been included in the Plan Documents.

A fact is material if a reasonable person would consider it important in determining his course of action. The court may decide materiality as a matter of law if the fact misrepresented is so obviously unimportant that a reasonable person would not have attached importance to it. *Id.* (citing the Restatement (Second) of Torts § 538).

The court finds that details of the stock plan administration, i.e. whether some decisions were made by a smaller group of executives or all decisions were made by the entire board of directors, is not a material fact affecting the "essence" of the contract. Therefore, Southwestern was under no duty to disclose, as a matter of law. Moreover, the court does not believe that a reasonable investor would have been influenced by knowing precisely how decision-making responsibility was allocated with regard to the stock plan administration.

### 3. Alleged Omission of a "Secret" Stock Payout Policy

Mr. Ulloa and Ms. Francis also allege that Southwestern committed fraud when it failed to disclose in the Plan Documents a "secret policy" regarding stock repurchase. They allege that Southwestern had a secret policy not to repurchase stock from terminated employees unless the employees agree to a conditional payout over time and that this "secret policy" was material information that should have been included in the Plan Documents.[5] As with the securities fraud claims, the Companies argue that Mr. Ulloa and Ms. Francis were on notice that Southwestern might choose not to repurchase their shares under any circumstance and that it was not necessary to specify under what exact circumstance Southwestern would repurchase stock.

At this juncture, the Court cannot say that the existence of a secret policy regarding stock repurchase, if proven, is not material as a matter of law. The Court finds that Mr. Ulloa and Ms.

---

[5] Mr. Ulloa's and Ms. Francis's allegations are specifically that information about the stock repurchase policy should have disclosed in the Private Placement Memoranda.

Francis have sufficiently pleaded the elements of fraud as to this issue and that the elements have been pleaded with particularity to satisfy Rule 9.

For the reasons stated, the Court finds that Mr. Ulloa and Ms. Francis have sufficiently pleaded fraud only as to the allegation that the Companies had a secret plan regarding stock repurchase and that they were obligated to disclose the existence of the plan in the Plan Documents. The Motion to Dismiss the claim of fraud, only as to this issue, is **DENIED**. As to all other issues, the Motion to Dismiss the fraud claim is **GRANTED**.

### C. Conversion

Mr. Ulloa and Ms. Francis assert a claim for conversion alleging they invested money in Southwestern's stock plan and that Southwestern wrongfully refuses to redeem their stock. (Doc. No. 251 at ¶¶ 48-49; Doc. No. 252 at ¶¶ 48-49.) Great American and Southwestern assert in defense, that the Plan Documents are clear that Southwestern has no obligation to repurchase stock and therefore Mr. Ulloa and Ms. Francis cannot claim a right to the repurchase of their stock.

Under Tennessee law, conversion is "an intentional tort, and a party seeking to make out a prima facie case of conversion must prove (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights." *PNC Multifamily Capital Institutional Fund XXVI Ltd. Partnership v. Bluff City Community Development Corp.,* 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012). A cause of conversion occurs when the alleged wrongdoer exercises dominion over the funds in "defiance of the owner's rights." *Shipwash v. United Airlines, Inc.*, 28 F.Supp.3d 740, 753 (E.D. Tenn 2014) (citing *Ralston v. Hobbs*, 306 S.W.3d, 213, 221 (Tenn. Ct. App. 2009).) In order to maintain a claim for conversion, a plaintiff must show a right to possession of the item converted at the time of its conversion. *Id.* (citing *Hawkins v. Hart*, 86 S.W.3d 522, 533 (Tenn. Ct. App. 2009).) *See*

*also, AHCI, Inc. v. Short,* 878 S.W.2d 112, 114 (Tenn. Ct. App. 1993) ("[C]onversion can be maintained only if the plaintiff can show possession or a right to immediate possession of the item converted at the time of the alleged conversion.") (quoting *Mammoth Cave Production Credit Assoc. v. Oldham,* 569 S.W.2d 833, 837 (Tenn. App. 1977)).

The Court concludes that Mr. Ulloa has not alleged facts indicating that Southwestern is holding his investment "in defiance of [his] rights," because he has signed a contract to purchase shares in Southwestern and the Plan Documents state that Southwestern "is not required to [re]purchase" the shares. *See United Telephone Southeast, LLC v. Bristol Tennessee Essential Services,* 2015 WL 13186245 (E.D. Tenn. 2015) (dismissing plaintiff's claim of conversion when a contract between the parties provided for defendant's use of the property, even when plaintiffs alleged breach of contract).

Ms. Francis, on the other hand, states that she may not have received the Plan Documents and that Southwestern is holding money that is rightfully hers. Without a signed contract and without reference to the Plan Documents, it is not clear whether Ms. Francis is entitled to the repurchase of her stock or a return of her investment money. Because the question of Ms. Francis's entitlement to the investment money cannot be determined at this stage in the litigation, her conversion claim cannot be dismissed.

For the reasons stated, the Motion to Dismiss Mr. Ulloa's claim for conversion is **GRANTED**, and the Motion to Dismiss Ms. Francis's claim for conversion is **DENIED**.[6]

### D. Breach of Contract

To establish a breach of contract, a plaintiff must show (1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by

---

[6] Discovery may reveal that Ms. Francis's claims should suffer the same fate as Mr. Ulloa's claims. However, at this juncture the Court cannot reach that conclusion.

the breached contract. *Bridgestone Am.'s Inc. v. Int'l Bus. Machines Corp.*, 172 F. Supp. 3d 1007, 1019 (M.D. Tenn. 2016). "In the context of a motion to dismiss, a breach of contract claim must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery." *Id*.

Mr. Ulloa and Ms. Francis each had employment agreements with Great American that included a compensation schedule. (Doc. No. 252 at ¶ 77; Doc. No. 251 at ¶ 77.) They allege that they were not paid in accordance with the compensation schedule because they invested in the stock plan and did not receive the entirety of their income. *Id*.[7] The Companies argue that there is no breach of the employment agreement because the investment in the stock plan was pursuant to a separate contract, that the employees were paid as required by the compensation schedule and then chose to invest a portion of their pay in the stock plan.

Mr. Ulloa's allegation states that he "chose to invest a portion of his income under the compensation schedule in the Stock Plan." (Doc. No. 252 at ¶ 79.) Mr. Ulloa does not claim that the stock plan was part of his compensation pursuant to the employment agreement. The Plan Documents that Mr. Ulloa signed further support the conclusion that the stock investment was pursuant to a contract separate and apart from his employment agreement. Both the Option Agreements and the Subscription Agreements are separate contracts which make no reference to Mr. Ulloa's employment agreement. (*See* Doc. No. 260, Exs. G-M.) Mr. Ulloa's allegations are, therefore, insufficient to support breach of contract claim with regard to his employment contract.

Ms. Francis also alleges that Great American breached her employment contract by failing to pay the entirety of income guaranteed in the compensation schedule because she chose to invest

---

[7] To the extent that Mr. Ulloa's and Ms. Francis's arguments are alleging fraudulent inducement to contract, those arguments have been dealt with in the Court's discussion of the viability of the fraud claims. *See supra*, section III,A.

some of her income in the stock plan. (Doc. No. 251 at ¶ 79.)  She alleges that she had an employment contract with Great American, that the employment contract included a compensation schedule, and that she did not receive income in accord with the compensation schedule because some of her money was invested in the stock plan. (*Id.*) Unlike Mr. Ulloa, Ms. Francis may not have a separate contract for her stock investment.  Therefore, questions remain as to whether Ms. Francis's investment in the stock plan is part of her employment agreement and what the rights and obligations of the parties are with regard to the stock investment.  Because these issues cannot be determined at this stage in the litigation, Ms. Francis's breach of contract claim cannot be dismissed.

For the reasons stated, the Motion to Dismiss Mr. Ulloa's breach of contract claim is **GRANTED**, and the Motion to Dismiss Ms. Francis's breach of contract claim is **DENIED**.

### E.  Breach of the Implied Covenant of Good Faith and Fair Dealing

Mr. Ulloa and Ms. Francis assert claims for breach of the implied covenant of good faith and fair dealing based on Southwestern's refusal to repurchase the stock.  They claim that when making the decision whether to repurchase stock, Southwestern was obligated to do so in good faith and in a commercially reasonable manner.  (Doc. No. 251 at ¶¶ 83-84; Doc. No. 252 at ¶¶ 83-84.)

Tennessee courts have consistently recognized an implied covenant of good faith and fair dealing in every contract.  *Dick Broadcasting Co., Inc. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 661 (Tenn. Ct. App. 2013).  The common law duty of good faith does not extend beyond the agreed terms of the contract and the reasonable contractual expectations of the parties. *Id.* (citing *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 687 (Tenn. 1996)).  "[T]he implied obligation of good faith and fair dealing … [cannot] be used to circumvent or alter the

specific terms of the parties' agreement." *Id*. at 666 (citing *Lamar Adver. Co.*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009)). However, while the implied covenant of good faith and fair dealing "does not create new contractual rights or obligations, it protects the parties' reasonable expectations as well as their right to receive the benefits of their agreements." *Id*. (citing *Long v. McAllister-Long*, 221 S.W.3d 1, 9 (Tenn. Ct. App. 2006)). The implied covenant of good faith and fair dealing is not a stand-alone claim; rather it is part of a breach of contract claim. *See Lyons v. Farmers Ins. Exch.*, 26 S.W.3d 888, 894 (Tenn. Ct. App. 2000).

Breach of implied covenants is not a stand-alone claim, therefore, for purposes of this motion to dismiss, the Court infers that Mr. Ulloa is stating a claim for breach of contract due to a breach of the implied covenant of good faith and fair dealing with respect to the stock plan agreements. Mr. Ulloa asserts that Southwestern was obligated to decide whether to repurchase the stock in good faith and in a commercially reasonable manner. The terms of the Plan Documents are clear that "the Company shall have the option to purchase, but *is not required to purchase*, the Shares of the Option holder." (Doc. No. 261, Exs. A-G (emphasis added).) Accordingly, Southwestern is not required to purchase the shares, thus Mr. Ulloa did not have a reasonable expectation that it would repurchase the shares. Moreover, the Southwestern's alleged conditions to repurchase the shares – that the employee not engage in competition with the Company and not disparage the company – appear to be grounded in valid business considerations.

Ms. Francis makes identical claims. However, unlike Mr. Ulloa, Ms. Francis may not have a separate signed contract for her stock investment. Therefore, questions remain as to the contractual rights and obligations, if any, of the parties with regard to her investment. Because these issues cannot be determined at this stage in the litigation, Ms. Francis's breach of contract claim based on breach of the implied covenant of good faith and fair dealing cannot be dismissed.

For the reasons stated, the Motion to Dismiss Mr. Ulloa's claims for breach of the implied covenant of good faith and fair dealing is **GRANTED**, and the Motion to Dismiss Ms. Francis's claims for breach of the implied covenant of good faith and fair dealing is **DENIED.**

### F. Unjust Enrichment

In the Amended Complaints, Mr. Ulloa and Ms. Francis assert claims for unjust enrichment, reasoning that Great American or Southwestern received the benefit of their respective payroll deduction for the stock plan investment. Each qualifies their claims by recognizing that the claim exists "to the extent that [Southwestern] or [Great American] failed to provide the required documentation … or to obtain [his/her] signature on the required documents (e.g. the Option Agreements and Subscription Agreements)." Doc. No. 251 at ¶ 51; Doc. No. 252 at ¶ 51.)

A claim for unjust enrichment must allege (1) that a benefit was conferred on the defendant; (2) the defendant appreciated the benefit; and (3) it would be unjust for the defendant to retain the benefit without providing compensation. *Metropolitan Gov't of Nashville and Davidson Cty. v. Cigna Healthcare of Tenn., Inc.*, 195 S.W.3d 28, 33 (Tenn. Ct. App. 2005). As a matter of law, an unjust enrichment claim can be maintained only if an actual contact, a contract implied in fact, does not exist between the parties. *Id.* ("[b]ecause a contract implied in fact exists, [Plaintiff] is precluded from recovering damages under the equitable theory of unjust enrichment").

With regard to Mr. Ulloa's claim, a contract between the parties regarding the share plan exists, as evidenced by the Option Agreements and Subscription Agreements signed by Mr. Ulloa. (Doc. No. 260, Exs. G-N.) Therefore, there can be no equitable remedy for unjust enrichment.

With regard to Ms. Francis however, questions remain as to the contractual rights and obligations, if any, of the parties. Because these issues cannot be determined at this stage in the litigation, Ms. Francis's unjust enrichment claim cannot be dismissed.

For the reasons stated, the Motion to Dismiss Mr. Ulloa's claim for unjust enrichment is **GRANTED**, and the Motion to Dismiss Ms. Francis's claim for unjust enrichment is **DENIED**.

### G. Tennessee Consumer Protection Act

Mr. Ulloa and Ms. Francis allege generally that Great American and Southwestern have committed "unfair and deceptive acts or practices … by operating the Stock Plans." (Doc. No. 251 at ¶ 54; Doc. No. 252 at ¶ 54.)

To state a claim under the Tennessee Consumer Protection Act ("TCPA"), the plaintiff must allege that the defendant engaged in an unfair or deceptive act or practice enumerated in section 47-18-104(b). TENN. CODE ANN. § 47–18–109(a)(1). The TCPA lists 51 specific acts or practices that are unlawful. *Id*. § 47-18-104(b). In addition to the list of specific unlawful practices, the TCPA includes a general provision encompassing "any other act or practice which is deceptive to the consumer or to any other person." *Id*. § 47-18-104(b)(27). The general provision in section (b)(27) is not privately enforceable; it is only enforceable by the Tennessee Attorney General. TENN. CODE ANN. § 47–18–104(b)(27). The cases cited by Mr. Ulloa and Ms. Francis in support of the viability of their TCPA claim were prior to the 2011 amendment, which eliminated the private enforceability of the general provision.

Mr. Ulloa and Ms. Francis have not alleged facts that establish one of the privately enforceable unlawful practices specifically described in the TCPA. While they may have stated facts sufficient to allege unfair or deceptive practices, the conduct alleged does not fall within one of the privately enforceable prohibitions of the TCPA.

For these reasons, the Motion to Dismiss Mr. Ulloa's and Ms. Francis's TCPA claims is **GRANTED**.

### H.  RICO, 18 U.S.C. § 1962

In their Second Amended Complaints, both Mr. Ulloa and Ms. Francis claimed that Great American and Southwestern had violated the RICO statutes.  (Doc. No. 251 at ¶¶ 71-73; Doc. No. 252 at ¶¶ 71-73.)  Great American and Southwestern moved to dismiss the RICO claims on the grounds that securities fraud is not a predicate act for a RICO claim.

The Private Securities Litigation Reform Act ("PSLRA") amended the RICO statute to eliminate securities fraud as a predicate act to form the basis of a civil RICO claim. 18 U.S.C. § 1964(c).  The amended RICO statute provides: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court …, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." *Id.*  The amendment also prevents a plaintiff from "relying on other predicate acts if they are based on conduct that would have been actionable as securities fraud." *See Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999).

Mr. Ulloa's and Ms. Francis's Amended Counterclaims allege fraud in the connection with the sale of securities.  They conceded in their Joint Response to the dismissal of the RICO claims. (Doc. No. 271 at 3.)  For these reasons, the Motion to Dismiss the RICO claims of Mr. Ulloa and Ms. Francis is **GRANTED**.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE